Filed 11/22/23  Barbey v. PNC Bank CA2/6
Opinion following rehearing

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| ANGELIQUE BARBEY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PNC BANK, N.A., et al., as Trustees, etc.,<br><br>    Defendants and Appellants. | 2d Civil No. B325472<br>(Super. Ct. No. 21PR00053)<br>(Santa Barbara County)<br><br>OPINION ON REHEARING |

Appellants PNC Bank, N.A. (PNC), Juliana Chugg, and Clarence Otis are the trustees of The Mary Glyde Barbey Irrevocable Trust for the benefit of respondent Angelique Barbey ("the Angelique Trust").  Respondent petitioned the Santa Barbara County Probate Court (the probate court) to instruct appellants to make distributions to her of income from the Angelique Trust.  Appellants appeal an order instructing them to pay respondent a lump sum of $1 million to cover her attorney fees arising from litigation involving the Angelique Trust.

Respondent moved to dismiss the appeal, claiming that it had been taken from a nonappealable order. We deny the motion. Appellants contend the probate court (1) lacked subject matter jurisdiction over the Angelique Trust, (2) erroneously overruled their demurrer to respondent's petition because she had failed to join indispensable parties, and (3) erroneously denied their request for an evidentiary hearing. The first contention is without merit, but the second and third contentions are meritorious.

We reverse the probate court's order instructing appellants to make the $1 million payment to respondent. We remand the matter to the probate court with directions to sustain appellants' demurrer with leave to amend the petition to join necessary parties. We also direct the probate court to conduct further proceedings consistent with the views expressed in this opinion.

*Factual and Procedural Background*

In August 1951 J.E. Barbey signed a deed of trust creating an irrevocable trust ("the J.E. Barbey Trust") for the benefit of his daughter, Mary Barbey Hooker, also known as Mary Glyde Barbey, hereafter "Mary."[1] When J.E. Barbey signed the deed of trust, he resided in Pennsylvania. During Mary's lifetime, the

---

[1] In the probate court appellants alleged in their demurrer dated September 28, 2022: "The original principal of the J.E. Barbey Trust consisted entirely of shares of the common stock of Vanity Fair Mills, Inc., a business founded in the 19th Century by the Barbey family. . . . The individual Trustees [of the Angelique Trust], Juliana Chugg and Clarence Otis, are experienced business executives who serve as members of the board of directors of VF Corporation, the successor to Vanity Fair Mills, Inc. . . . VF Corp. has annual revenues over $11 billion and a market capitalization over $13 billion."

entire net income of the trust would be paid to her.  Mary was granted "the power, exercisable by will, to appoint . . . any or all of the net income and of the principal to or in trust for such of her issue and in such manner and amounts or proportions as she may elect . . . ."  If she did not exercise her power of appointment, upon her death each of her children would receive an equal share of the trust principal.  Each child would be paid the net income from his or her share.

The deed of trust provides: "The situs of this trust shall be Pennsylvania; and all questions concerning the construction, validity, or administration of this trust shall be governed by the law of that Commonwealth."

Mary died in October 2002.  In her will she exercised the power of appointment.  She signed the will in August 1994.  At that time as well as the time of her death, she resided in Santa Barbara County.

Mary had five children.  As the probate court noted, "In her Will, and pursuant to the power of appointment, Mary Barbey created five separate sub-trusts for each of her children."  The will provided that, except for respondent, the J.E. Barbey Trust's assets shall be divided equally among Mary's children.  During each child's lifetime, except for respondent the child shall be paid the net income from his or her share.

As to respondent, the Trustee of the J.E. Barbey Trust "'shall allocate to the trust for her son Grant Barbey [now known as her daughter, respondent Angelique Barbey,[2]] . . . the lesser of

---

[2] Respondent's April 2021 petition states that she "formerly held the legal name of Grant Barbey and was previously referenced using 'he/him/his' pronouns."  On January 4, 2018, the name "Grant Barbey" was "legally chang[ed]" to "Angelique

3

(a) Four Million dollars . . . or (b) twenty percent . . . of the principal of the trust as it exists at the date'" of Mary's death. During respondent's lifetime, she shall be paid "'[a]s much of the net income from [her] share . . . as the Trustee considers to be reasonable and appropriate, in the discretion of the Trustee, up to and including all of such net income.'" Respondent shall also be paid "'[a]s much of the principal of [her] share as the Trustee . . . may . . . decide to be necessary to meet any emergency affecting [her] health . . . or maintenance.'" Upon respondent's death, "'any then remaining principal of [her] share shall be divided, per stirpes, among Mary Glyde Barbey's then living issue other than [respondent's issue] . . . .'" Mary's will stated, "Except as expressly modified above, all other terms and conditions of the [J.E. Barbey] Trust, as established by my father, . . . shall remain in full force and effect."

In January 2021 respondent's brother and trust beneficiary, Thomas Barbey, filed a petition in the probate court. The first amended petition, the operative pleading, alleged that respondent's financial managers "have consistently used their control over [respondent's] finances and her accounts as well as their position of trust and confidence with [her] to take advantage of her and to misappropriate and/or misspend the [Angelique] Trust resources that are intended to benefit [respondent] . . . ." The petition sought to compel the financial managers "to return all Trust assets misappropriated by [them], and all interest thereon or income therefrom." Respondent and appellants were not joined as parties to Thomas Barbey's probate petition.

---

Barbey," and the gender was "legally chang[ed]" from male to female.

4

Respondent resided in Santa Barbara County. In April 2021 respondent filed a petition in the probate court requesting various forms of relief ("the April 2021 petition"). The petition had the same caption and case number as Thomas Barbey's petition. The petition alleged: "The [Angelique] Trust was originally funded with four million dollars, but has grown substantially over the years, with a value of over 45 million dollars as of December 31, 2020.[3] [¶] . . . For many years, [respondent] had been the recipient of Trust income distributions . . . for her health, maintenance, and best interests. These distributions were ordinarily made in quarterly – or near quarterly – payments, totaling approximately $250,000 annually, and in some years much more." "After December 2017, distributions to [respondent] abruptly ceased. This sudden change . . . coincided with the grant of a decree finalizing [respondent's] legal name and gender change [see fn. 2 at pp. 3-4, *ante*] – an undertaking by [respondent] that was not supported by her family members . . . ." Appellants acknowledge that "[d]istributions were not made for a period from 2018 through mid-2021 . . . ."

The petition's requested relief included (1) the removal of PNC as a trustee of the Angelique Trust, (2) the appointment of a successor trustee, (3) the annual payment to respondent of $250,000 from the income of her trust, and (4) an order requiring "Trustees, and any successor to them, to address the conduct

---

[3] The probate court observed, "Since funding, the [Angelique] Trust has experienced what [appellants] refer to as 'explosive growth' in the value of the Trust's assets and the income the Trust generates."

5

of . . . Thomas Barbey, who has purported to act on behalf of the [Angelique] Trust, in place of the Trustees." In addition, respondent requested that the trustees "immediately make retroactive distributions to [her], pending adjudication of this matter, in the amount of $250,000 per year, for the years 2018, 2019, 2020, and prorated for the year 2021 until the date that regular disbursements are resumed."[4]

Appellants filed a motion to quash or dismiss respondent's petition. One of the grounds for the motion was that the probate court lacked "in rem jurisdiction over the [Angelique] Trust." (Italics omitted.) The probate court denied the motion.

Appellants filed in this court a petition for a writ of mandate. They sought an order directing the probate court to grant their motion. We summarily denied the petition. (*PNC Bank, N.A., et al., v. Superior Court of Santa Barbara County*, July 21, 2021, B313559; rev. denied Sept. 15, 2021, S270155.)

In October 2021 the probate court ordered appellants to distribute to respondent $15,000 "per month . . . from the [Angelique] Trust's income, retroactive to January 2021, and continuing until further order of [the] Court."

In June 2022 respondent filed her Second Amended Petition, the operative pleading in respondent's action against appellants, hereafter "the Second Amended Petition." The Second Amended Petition requested, inter alia, "an order instructing [appellants] . . . to make distributions to [respondent] in the amount of the greater of either $500,000 per year or the annual net income of the Trust, from January 1, 2022,

---

[4] Appellants will have to account for this non-payment in a subsequent proceeding.

forward . . . ." It also requested the removal of all of the appellants, not just PNC, as trustees of the Angelique Trust.

In August 2022 respondent filed a separate document entitled, "Petition to Instruct Trustees to Make Further Interim Distributions During Pendency of Litigation," hereafter "the Distribution Petition," not to be confused with "the Second Amended Petition." Respondent requested that appellants be instructed "to immediately distribute [to her] $1,000,000 of the $1,155,894 retained income held in the Trust as of June 30, 2022 . . . ." Respondent claimed she needed the funds "to ensure that [she] has access to sufficient resources to represent her interests in the extensive litigation" concerning her trust. She alleged, "[Appellants] have failed and refused to make any distributions . . . to provide her with resources to pay for counsel . . . ." Respondent also requested that appellants be instructed to continue making trust income distributions to her of $15,000 per month.

Appellants demurred to the Distribution Petition, claiming "that there is a nonjoinder of necessary and indispensable parties." Appellants argued that "the [Angelique] [T]rust's remainder beneficiaries ([respondent's] siblings) and contingent remainder beneficiaries (the issue of [respondent's] siblings) all must be parties to [the] action . . . ."

In its minute order overruling the demurrer, the probate court noted: "By failing to distribute all net income and retaining it into the trust, [appellants] have converted the [Angelique] Trust's income to principal, which harms Angelique's interests and benefits the remainder beneficiaries' interests . . . . In 2020 alone, [appellants] transferred $2.2 million of income to the [Angelique] Trust's principal account, causing irreparable harm

7

to [respondent]. As of June 30, 2022, [appellants] were holding more than $1.1 million in undistributed income, and estimated that the [Angelique] Trust would receive additional income of $566,000. The [Angelique] Trust has earned income of approximately $5.3 million since [appellants] ceased making distributions to [respondent], yet has only distributed $270,000 to [respondent] in that time period ($15,000/month, ordered by the court)."

Appellants "request[ed] that, before deciding whether any relief may be appropriate, the Court conduct an evidentiary hearing at which [respondent] should be required to testify and present admissible evidence concerning the factual bases for the relief she seeks." Without conducting an evidentiary hearing, the probate court instructed appellants to make the distribution of funds requested by respondent.

Appellants timely filed an appeal from the probate court's order. In their opening brief they limit their appeal to the "order instructing [appellants] to distribute $1,000,000 of net income from the [Angelique] Trust to [respondent]."

*Respondent's Motion to Dismiss Appeal*

Respondent moved to dismiss the appeal, claiming that the probate court's order requiring the distribution of trust funds is a nonappealable order. The motion is denied.

Code of Civil Procedure section 904.1, subdivision (a)(10) provides that an appeal may be taken "[f]rom an order made appealable by the Probate Code." The order at issue here is appealable pursuant to Probate Code section 1300, subdivision (c), which allows an appeal from an order "instructing, or

8

directing a fiduciary."[5]  As trustees of the Angelique Trust, appellants are fiduciaries.  The order is also appealable pursuant to section 1300, subdivision (e), which allows an appeal from an order "[f]ixing, authorizing, allowing, or directing payment of compensation or expenses of an attorney."

Respondent argues that the order is not appealable because "[i]t is not a final order on [her] Second Amended Petition . . . ." Instead, "[i]t is an interim order on an interim matter under . . . section 17206 – a request for a pendente lite distribution of trust funds."[6]  The order "does not finally dispose of the disputes between the parties, as set out in [respondent's] Second Amended Petition . . . ."  That petition is "still being actively litigated."

The applicable statutes do not limit appeals to only those orders that finally dispose of all disputes between the parties. Respondent contends such a finality "requirement should be implied in the statute."  We disagree.  "When interpreting statutes, 'we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law . . . .  "This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed."'"  (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 59.)

It is arguable that appellants would have been bound by the probate court's order if they had failed to appeal it.  (See *Estate of Gilkison* (1998) 65 Cal.App.4th 1443, 1450, fn. 5 ["The orders listed as appealable in the Probate Code must be

_____

[5] Unless otherwise stated, all statutory references are to the Probate Code.

[6] Section 17206 provides, "The court in its discretion may make any orders and take any other action necessary or proper to dispose of the matters presented by the petition . . . ."

challenged timely or they become final and binding.  They may not be collaterally attacked in a subsequent appeal from the final order of distribution"].)

*The Probate Court Had Subject Matter Jurisdiction*

Appellants contend the probate court "lacked subject matter jurisdiction to issue the challenged order" instructing them to make the $1 million payment to respondent.  (Bold and capitalization omitted.)  They do not contend the probate court lacked jurisdiction over their persons.  Nor do they contend the probate court's assumption of jurisdiction violated their right to due process under the Fourteenth Amendment of the United States Constitution.  (See *Shaffer v. Heitner* (1977) 433 U.S. 186 (*Shaffer*); *International Shoe Co. v. Washington* (1945) 326 U.S. 310, 316.)

"Subject matter jurisdiction is a fundamental requirement for judicial consideration of claims.  'The California Supreme Court has defined subject matter jurisdiction thusly: "Subject matter jurisdiction . . . is the power of the court over a cause of action or to act in a particular way." [Citations.]  By contrast, the lack of subject matter jurisdiction means the entire absence of power to hear or determine a case; i.e., an absence of authority over the subject matter.  [Citations.]  Where the evidence is not in dispute, a determination of subject matter jurisdiction is a legal question subject to de novo review.' [Citation.]  Subject matter jurisdiction may not be ""'conferred by consent, waiver, agreement, acquiescence, or estoppel.'" . . .' . . . '[A]ny judgment or order rendered by a court lacking subject matter jurisdiction is "void on its face . . . ." . . .'"  (*Saffer v. JP Morgan Chase Bank, N.A.* (2014) 225 Cal.App.4th 1239, 1248.)

Appellants argue: "Probate proceedings are proceedings in rem." "A court's jurisdiction over a proceeding in rem is based on its authority over property within its territory that is the subject of dispute." (See *Hanson v. Denckla* (1958) 357 U.S. 235, 246 ["The basis of [in rem] jurisdiction is the presence of the subject property within the territorial jurisdiction of the forum State"]; *Shaffer*, *supra*, 433 U.S. at p. 199 ["If jurisdiction is based on the court's power over property within its territory, the action is called 'in rem' or 'quasi in rem.' The effect of a judgment in such a case is limited to the property that supports jurisdiction"]; *Estate of Buckley* (1982) 132 Cal.App.3d 434, 443 ["A probate proceeding is essentially an in rem proceeding, in which the decedent's assets within the state constitute the res"].)

Appellants continue: "[T]he [probate] court lacked jurisdiction over the [Angelique] Trust because the trust is outside the territorial jurisdiction of the court. This proceeding involves an irrevocable inter vivos trust [i.e., a trust created during the trustor's lifetime] that was established in 1951 by . . . John E. Barbey. [Record citation.] By the express terms of the Deed of Trust . . . the situs of the trust 'shall be Pennsylvania.' [Record citation.] The trust is administered through the trust office of PNC Bank, N.A. in Philadelphia, Pennsylvania. [Record citation.] The assets of the trust—including assets that the trial court ordered to be distributed to [respondent]—consist of cash and securities held through the trust department of PNC Bank in Pennsylvania. [Record citation.] As such, the subject of [respondent's] claims is located in Pennsylvania. California courts therefore lack jurisdiction to decide matters relating to the internal affairs of the [Angelique] Trust because California does not have 'jurisdiction over the trust.'" (Fn. omitted.) "[T]he

11

determinative issue" is that "the [Angelique] Trust cannot be found within the territorial jurisdiction of the California courts." The authority "to adjudicate matters related to the internal affairs of the [Angelique] Trust . . . resides with the courts in Pennsylvania."

Appellants made a similar argument in the probate court in support of their motion to dismiss respondent's April 2021 petition for lack of "in rem jurisdiction over the [Angelique] Trust." (Italics omitted.) In denying the motion, the probate court reasoned: "[Appellants] ignore the fact that the [Angelique] Trust is a testamentary trust that was created pursuant to the power of appointment in the Will of Mary Barbey, [respondent's] mother. [Record citation.] Mary Barbey was a resident of Santa Barbara County and following her death in 2002, her Will was probated in Santa Barbara County . . . . Because the [Angelique] Trust arose by exercise of a power of appointment in the Will of Mary Barbey, which was probated in Santa Barbara County, this court may properly exercise in rem jurisdiction over the trust, which was created for [respondent's] benefit." (Italics omitted.)

Appellants maintain that the Angelique Trust is not a testamentary trust because it was not "funded by assets of [Mary's] estate." It was funded by Mary's father, J.E. Barbey. (See 13 Witkin, Summary of Cal. Law (11th ed., May 2023 update) ch. XX, Trusts, § 2, p. 611 ["A testamentary trust is one created in a decedent's will and funded by a distribution of probate assets"].)

Appellants also claim the Angelique Trust is not a testamentary trust because it is a continuation of the trust created by Mary's father: "[T]he [Angelique] Trust is a continuation of the irrevocable *inter vivos* trust created by John

12

E. Barbey through the 1951 Deed of Trust.  That the [probate] court probated Mary's Will following her death in 2002 does not grant it jurisdiction over the assets in or the administration of an irrevocable *inter vivos* trust that existed prior to and outside of probate."

In support of their position, appellants cite the following excerpt from the Restatement (Second) of Trusts, § 427, Comment a: "A person [such as Mary] who has a special power of appointment, unlike a person who has a general power of appointment . . . , has not such an interest in the property as to make him in substance the owner of the property.  If he makes an appointment of the property in trust, the donor of the power [here J.E. Barbey] and not the donee is the creator of the trust; and if the trust fails and a resulting trust arises, it arises in favor of the donor of the power or his estate, and not in favor of the donee or his estate."  "A general power of appointment is one which may be exercised in favor of anyone, including the donee, and is equivalent to a grant of absolute ownership.  A special power is one which may be exercised in favor of certain specified individuals or to a class of designated persons, not including the donee or his estate."  (*Estate of Thorndike* (1979) 90 Cal.App.3d 468, 473.)[7]

---

[7] See also Restatement (Second) of Conflict of Laws, § 274, Comment (b) (Restatement): "It is frequently said that the property which passes upon the exercise of a power of appointment is the property of the donor and not the property of the donee of the power.  It is said that the instrument by which the power is exercised is to be read back into the instrument which created the power.  For this reason it is said that the substantial validity of the exercise of the power is determined by the law which determines the validity of the trust under which

*In re Masson's Estate* (1956) 142 Cal.App.2d 510, supports appellants' claim that the Angelique Trust is not a testamentary trust: "We may take it as the general rule that where property is placed in trust for the life of a beneficiary and the beneficiary is the donee of a power of appointment to dispose of the corpus by will, the persons appointed by the donee take directly from the trustees and not through the estate of the donee of the power. [Citations.]" (*Id.*, at p. 512.)

Because the Angelique Trust is a continuation of the inter vivos J.E. Barbey Trust created in 1951, the situs of the trust – Pennsylvania – has primary supervision over the internal affairs of the Angelique Trust. "Where the trustee has qualified as trustee in a court of the state in which the trust is to be administered, that court has primary supervision over the administration of the trust. It has and will exercise jurisdiction as to all questions which may arise in the administration of the trust." (Restatement, *supra*, at § 267, comment e.) But Pennsylvania does not have exclusive jurisdiction as to matters concerning the Angelique Trust's internal affairs. "[I]f a court *acquires jurisdiction over the trustee* it may entertain a suit to compel him to redress a breach of trust, even though the trustee has qualified as trustee in a court of another state or the administration of the trust is in another state. It may compel the

_____

the power was created. [¶] This is undoubtedly so where the power is a special power, that is, a power to appoint among a limited class of persons. The appointees take the property from the donor rather than from the donee, even though the donee may select which members of the class shall take and in what proportions."

14

trustee to render an accounting or it may even remove the trustee." (*Ibid.*, italics added.)

The probate court ruled that it had acquired personal jurisdiction over appellants. It gave a detailed explanation of its ruling. Neither appellants' appellate briefs nor their petition for rehearing contests the probate court's finding that it had personal jurisdiction over them. Accordingly, for purposes of this appeal, we assume the probate court had personal jurisdiction over appellants.[8]

As to subject matter jurisdiction, guidance is provided from a leading treatise on trusts: Bogert et al., The Law of Trusts and Trustees (June 2023 update) (Bogert). According to Bogert, the Angelique Trust is a "multistate trust," i.e., "a trust having significant contacts or relationships with more than one state." (*Id*. at § 291.) "In determining whether it has jurisdiction to entertain the proceedings [involving a multistate trust] . . . , the forum court in which the proceedings are brought must consider the nature and extent of the various contacts that the several states have with the trust. These contacts may include the domicile of the settlor or testator at the time of creation of the trust or execution of the will, the testator's domicile at death, the trustee's domicile, the respective domiciles of the beneficiaries, the physical situs of the trust assets, [and] the state in which the

---

[8] In her appellate brief respondent states: "In the Probate Court, [appellants] also argued that the Court did not have in personam jurisdiction over any of them. . . . [Appellants] do not argue lack of in personam jurisdiction [over them] in the AOB [appellants' opening brief]. The argument is forfeited. [Citation.]" (See *Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 296, fn. 7 ["Issues not raised in the appellant's opening brief are deemed waived or abandoned"].)

15

trust is being administered (where other than that of the trustee's domicile) . . . ." (*Ibid*.) "Generally, a court has jurisdiction to adjudicate by reason of its relationship to the trust, the trust parties or the trust property which is sufficient to make its decree reasonable and recognized as valid in other states." (*Id., § 292.)

The forum court should also consider the issue in question. Here, the issue in question is appellants' obligation to pay to respondent "[a]s much of the net income from [respondent's] share [of the J.E. Barbey Trust] . . . as [appellants] consider[] to be reasonable and appropriate, in [their] discretion . . . ." This obligation is an intangible. "Being an intangible, it has no situs in fact. [¶] 'An intangible, unlike real or tangible personal property, has no physical characteristics that would serve as a basis for assigning it to a particular locality.'" (*Atkinson v. Superior Court* (1957) 49 Cal.2d 338, 342-343 (*Atkinson*).)

In *Atkinson* our Supreme Court refused to "attempt to assign a fictional situs to intangibles." (*Atkinson, supra,* 49 Cal.2d at p. 345.) The "intangibles in question" consisted of an employer's obligation to make "royalty payments and payments for reuse of motion pictures . . . ." (*Id.* at p. 340.) The employer's California employees and a nonresident trustee made conflicting claims to the payments. "The question presented . . . [was] whether the [intangibles] in question may be treated as being within this state . . . for purposes of exercising in rem or quasi in rem jurisdiction over it . . . ." (*Id.* at p. 343.) The Supreme Court considered the totality of California's contacts with the parties and the intangibles. The court reasoned: "It is significant that with respect to jurisdiction to tax intangibles [citation] . . . and jurisdiction to adjudicate *trust obligations* [citation], emphasis is

16

no longer placed on actual or physical presence but on the bearing that local contacts have to the question of over-all fair play and substantial justice." (*Id.* at p. 345, italics added.) The court continued: "It is true that for some purposes the state of incorporation may be peculiarly appropriate for the purpose of litigating conflicting claims to corporate stock, but if so, it is because of relevant contacts there; if such contacts exist elsewhere, jurisdiction also follows. [Citation.] [¶] Similarly, *in the case of other intangibles, jurisdiction must be determined in the light of the totality of contacts with the state involved.*" (*Id.* at pp. 346-347, italics added.) The court held, "[T]he multiple contacts with this state fully sustain the jurisdiction of the superior court to exercise quasi in rem jurisdiction over the intangibles in question." (*Id.* at p. 348; see also *Waite v. Waite* (1972) 6 Cal.3d 461, 468, disapproved on another ground by *In re Marriage of Brown* (1976) 15 Cal.3d 838, 851, fn. 14, and superseded by statute on another ground as stated in *In re Marriage of Carnall* (1989) 216 Cal.App.3d 1010, 1019 [jurisdiction over intangible pension rights "should be determined 'in the light of the totality of contacts with the state involved' and the 'bearing that local contacts have to the question of over-all fair play and substantial justice'"].)

 *Atkinson* is consistent with section 65 of the Restatement (Second) of Conflict of Laws. Section 65 provides, "A state has power to exercise judicial jurisdiction to affect interests in an intangible thing which is not embodied in a document if the relationship of the state to the thing and to the parties involved makes the exercise of such jurisdiction reasonable." The Reporter's Note to section 65 refers the reader to *Atkinson* "[f]or a case upholding the exercise of jurisdiction to affect interests in an

17

intangible thing . . . ." If the argument is made that the intangible thing here is embodied in a document, i.e., Mary's exercise of the power appointment in her will, the rejoinder to the argument is that the will is located in California, where it was probated. Section 63 of the Restatement (Second) of Conflict of Laws provides, "A state has power to exercise judicial jurisdiction to affect interests in an intangible thing embodied in a document which is within the state."

As in *Atkinson*, *supra*, 49 Cal.2d at p. 348, "the multiple contacts with this state fully sustain the jurisdiction of the [probate] court to exercise . . . jurisdiction over the intangibles in question," i.e., appellants' obligation to pay to respondent "[a]s much of the net income from [respondent's] share [of the J.E. Barbey Trust] . . . as [appellants] consider[] to be reasonable and appropriate, in [their] discretion . . . ." The Angelique Trust exists in its present form only because of Mary's exercise in her will of the power of appointment. Mary resided in California when she signed the will and when she died. Her will was probated in California. But for Mary's exercise of the power of appointment, under the J.E. Barbey Trust respondent would have been treated the same as her siblings. She would have received an equal share of the trust principal and would have been entitled to be paid the entire net income from her share. Both the Second Amended Petition and the Distribution Petition arose from Mary's exercise of the power of appointment in California. They did not arise from the creation of the J.E. Barbey Trust in 1951.

Moreover, respondent is the sole lifetime beneficiary of the Angelique Trust, and she resides in California. Until December 2017, respondent received annual income distributions of

18

approximately $250,000 from the Angelique Trust. "[A] state has a strong interest in assuring its own residents an adequate forum for the redress of grievances [citation]." (*Stangvik v. Shiley Inc.* (1991) 54 Cal.3d 744, 754-755.) "[T]he relationship of [California] to the [intangible] thing [i.e., appellants' obligation under the Angelique Trust created in California by Mary's exercise of her power of appointment] and to the parties involved [the sole lifetime beneficiary of the Angelique Trust resides in California] makes the exercise of . . . jurisdiction [by California] reasonable." (Restatement, *supra*, § 65.)

The probate court's subject matter jurisdiction is supported by *McElroy v. McElroy* (1948) 32 Cal.2d 828 (*McElroy*). There, prior to wife's action for divorce, husband transferred $6,000 in community funds to his parents. "[T]he money was removed to Oregon, where the parents now reside." (*Id.*, at p. 830.) Wife claimed she was entitled to $3,000 of the funds. She sued husband and his parents in a California court. Husband was served in Oregon and did not answer or appear. "The parents appeared and defended." (*Ibid.*) Wife "was given judgment against [husband's parents] in" the amount of $3,000. (*Ibid.*)

The parents appealed. They contended that "the court lacked jurisdiction to enter a money judgment against them." (*McElroy*, *supra*, 32 Cal.3d at p. 831.) "They argue[d] that the effect of the judgment was to adjudicate the respective interests of the husband and wife in property not located in California . . . ." (*Ibid.*)

The California Supreme Court upheld the trial court's finding "that the parents held the money transferred to them as trustees for [wife] and her husband." (*McElroy*, *supra*, 32 Cal.2d at p. 831.) The Supreme Court concluded: "The trust having been

19

created from community funds, the duty of parents under the trust ran to the community, and the wife's interest therein could be enforced by her in the divorce action if there was some basis for the court's jurisdiction over the trust obligation. . . . *Where, as in this case, the proceeding is brought to enforce the trustees' obligation, and the judgment does not undertake to operate directly on the corpus of the trust, the court's power to act is based upon jurisdiction over the trustees and not upon the location of the trust res. . . .* Accordingly, the obligation of the parents to the community may be treated as a community asset wherever the parents may be sued, and, the parents having appeared, the court had jurisdiction over them and over their personal obligation to the community." (*Ibid*, italics added.) Like the trial court in *McElroy*, the probate court here had jurisdiction over appellants as the trustees of the Angelique Trust and also over their obligation to the trust's sole lifetime beneficiary, who resides in California. The probate court therefore had jurisdiction to enforce that obligation.

The probate court may exercise jurisdiction in proceedings under the Trust Law (§ 15000 et seq.) "on any basis not inconsistent with the Constitution of this state or of the United States." (Code Civ. Proc., § 410.10; Prob. Code, § 17004.) In view of California's significant contacts with the Angelique Trust and its sole lifetime beneficiary, appellants have not carried their burden of showing that the probate court lacked subject matter jurisdiction. "'A judgment or order of the lower court is *presumed correct*. . . . [E]rror must be affirmatively shown. . . .'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

In their appellate briefs the parties do not discuss *Atkinson's* "totality of the contacts" test applicable to intangibles.

They do not mention the word "intangible." Government Code section 68081 provides, "Before . . . a court of appeal . . . renders a decision in a proceeding . . . based upon an issue which was not proposed or briefed by any party to the proceeding, the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing." We have not asked the parties to submit supplemental briefing on the "totality of the contacts" test because it is fairly included within the issues expressly raised by the parties concerning the probate court's subject matter jurisdiction. "The parties need only have been given an opportunity to brief the issue decided by the [appellate] court, and the fact that a party does not address an issue, mode of analysis, or authority that is raised or *fairly included within the issues raised* does not implicate the protections of [Government Code,] section 68081." (*People v. Alice* (2007) 41 Cal.4th 668, 679, italics added.)

In their petition for rehearing appellants argue that, in construing appellants' alleged obligation as an intangible, we have "fundamentally misconstrue[d] [respondent's] interest in the Angelique Trust." Appellants explain: "[W]here '[t]he beneficiary's interest in the trust is subject to the trustee's discretion[,] the beneficiary has no "right" to payments of trust property.' Bogert, [*supra*, at] § 228 . . . . With respect to a discretionary trust [such as the Angelique Trust], '[t]he beneficiary's interest is not "property" or a "right to property"' but instead the beneficiary has 'an expectancy only in the undistributed income and principal.' *Id*." (Fn. omitted.) "This court's Opinion, therefore, is founded upon an erroneous characterization of [respondent's] interest in the trust as intangible personal property when, under the law governing

21

trusts, it is a mere expectancy interest with respect to the assets of the Angelique Trust itself."

For our purposes it is immaterial whether respondent had only an "expectancy interest," rather than a property interest, in the Angelique Trust's income. We are not concerned with the nature of her interest. We are concerned with appellants' *intangible obligation* to exercise their discretion in good faith and in a reasonable manner when determining the amount of the trust income to be distributed to respondent. "Courts will always require the trustee to act in good faith and to accomplish the trust's purposes. They also often require the trustee to act reasonably." (Bogert, *supra*, at § 228.) "Even with a pure discretionary trust in which the trustee's discretion is 'sole and absolute,' or 'uncontrolled,' [such terms are not used in the Angelique Trust] . . . , the beneficiary may obtain judicial review to determine whether the trustee has abused that discretion." (*Ibid.*; see also Restatement (Third) of Trusts § 50, subsection (1) ["A discretionary power conferred upon the trustee to determine the benefits of a trust beneficiary is subject to judicial control only to prevent misinterpretation or abuse of the discretion by the trustee"].)

In their petition for rehearing appellants argue that "*Atkinson* and its 'totality of contacts' test have no relevance to the question presented in the present appeal, that is, the superior court's jurisdiction over a dispute related to the internal affairs of an out-of-state discretionary trust." "[T]he *Atkinson* case . . . did not arise under trust law and did not address the question of jurisdiction over the internal affairs of a trust." But *Atkinson's* "totality of the contacts" test is similar to the analysis set forth in the Bogert treatise on trusts: "In determining whether it has

22

jurisdiction to entertain the proceedings [where, as here, a multistate trust is involved] . . . , the forum court in which the proceedings are brought must consider the nature and extent of the various contacts that the several states have with the trust." (Bogert, *supra*, at § 291.) "[W]hether the forum court has adjudicatory jurisdiction will largely depend in the first instance upon the nature of the contacts that the forum state has to the trust, the trust parties or trust assets, and upon the type of relief sought." (*Id*., at § 292.)

Finally, in their petition for rehearing appellants claim we have "improperly weigh[ed] the 'totality of the contacts' without prior consideration and evidentiary development in the superior court, while completely ignoring the numerous factors supporting jurisdiction in Pennsylvania, not California." Appellants assert that "the matter should be remanded to the probate court to allow it to evaluate this issue on a record fully developed for this purpose." But appellants fail to specify the relevant factors that need "development" at an evidentiary hearing.

As to the allegedly "numerous factors supporting jurisdiction in Pennsylvania, not California," appellants appear to be raising a forum non conveniens issue. (*Stangvik v. Shiley Inc.* (1991) 54 Cal.3d 744, 751 ["Forum non conveniens is an equitable doctrine invoking the discretionary power of a court to decline to exercise the jurisdiction it has over a transitory cause of action when it believes that the action may be more appropriately and justly tried elsewhere"].) The probate court rejected appellants' claim that, pursuant to the forum non conveniens doctrine, it "should decline to exercise jurisdiction over [respondent's] claims because it would unduly interfere with the jurisdiction of the Pennsylvania Orphans' Court." For

23

various reasons, the probate court found "that the issues raised in [respondent's] action are best heard in California." Appellants have forfeited the forum non conveniens issue because they failed to raise it in their appellate briefs. (*Eck v. City of Los Angeles* (2019) 41 Cal.App.5th 141, 146.)

<em>The Probate Court Erroneously<br>Overruled Appellants' Demurrer</em>

Appellants contend the probate court erred in overruling their demurrer insofar as it was based "on the ground that remainder [beneficiaries, i.e., respondent's siblings,] and contingent remainder beneficiaries [i.e., the siblings' children,] . . . are indispensable parties . . . and were not joined as parties." (See Code Civ. Proc., § 430.10, subd. (d), authorizing a demurrer on the ground that "[t]here is a defect or misjoinder of parties"]; *Organizacion Comunidad De Alviso v. City of San Jose* (2021) 60 Cal.App.5th 783, 791 ["Failure to join an indispensable party is a ground for demurrer"].)

In the demurrer appellants alleged: "[Respondent] has failed to join her siblings and their children, who are necessary and indispensable parties to this proceeding, by failing to name them as respondents and by failing to effect service of process sufficient to compel their appearance before this Court. Indeed, because there is no showing that this Court could ever properly exercise jurisdiction over all such parties, the Distribution Petition is fatally defective, and [appellants'] demurrers must be sustained without leave to amend."

"'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a

24

reasonable interpretation, reading it as a whole and its parts in their context." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) "A 'decision to sustain or overrule a demurrer is subject to de novo review on appeal . . . .'" (*Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1394.)

"'Joinder of parties is governed by section 389 of the Code of Civil Procedure (section 389).' [Citation.] '[S]ection 389 subdivision (a) defines persons who should be joined in a lawsuit if possible, sometimes referred to as "necessary" parties. [Citation.] It provides: "A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party.""" (*Dreamweaver Andalusians, LLC v. Prudential Ins. Co. of America* (2015) 234 Cal.App.4th 1168, 1173 (*Dreamweaver*).)

"'A determination that a person is a necessary party [under section 389, subdivision (a)] is the predicate for the determination whether he or she is an indispensable party [under section 389, subdivision (b)] [citation] . . . . [Citation]. [¶] If a necessary party cannot be joined, [section 389, subdivision (b) provides that] the court shall "determine whether in equity and good conscience the action should proceed among the parties before it, or should

25

be dismissed without prejudice, the absent person being thus regarded as indispensable."'" (*Dreamweaver*, *supra*, 234 Cal.App.4th at p. 1173.)

"'The determination of whether a party is necessary or indispensable is one in which the court "weighs 'factors of practical realities and other considerations.'" [Citation.] In view of that standard, we review the trial court's ruling for abuse of discretion. [Citation.]' [Citations.] [¶] . . . 'It is the appellant's burden on appeal to show the trial court abused its discretion. . . ." (*Dreamweaver*, *supra*, 234 Cal.App.4th at pp. 1173-1174.)

Respondent asserts, "Probate Code section 17203, not Code of Civil Procedure section 389, governs service of the [Distribution Petition] on the [Angelique] Trust's remainder beneficiaries." (Bold omitted.) Respondent cites section 17203, subdivision (a)(2), which provides, "'At least 30 days before the time set for the hearing on the petition, the petitioner shall cause *notice* of hearing to be delivered to . . . [a]ll beneficiaries . . . .'" (Italics added.) Respondent argues that, because she "complied with the service requirements of section 17203," she was not required to join the remainder beneficiaries as indispensable parties pursuant to Code of Civil Procedure section 389. Respondent observes that, in its order overruling appellants' demurrer, the probate court found that appellants "make no claim that any of the remainder beneficiaries or contingent remainder beneficiaries were not provided with notice."

Section 17203, subdivision (a)(2) is merely a "notice" provision. Nothing in the Probate Code or case law suggests that section 17203 supplants section 389. Probate Code section 1000 provides, "Except to the extent that this code provides applicable

26

rules, the rules of practice applicable to civil actions . . . apply to, and constitute the rules of practice in, proceedings under this Code." If a beneficiary is an indispensable party under section 389, the petitioner cannot circumvent the joinder requirement of that section by providing the beneficiary with a 30-day advance notice of the hearing on the petition. (See *Ruttenberg v. Ruttenberg* (1997) 53 Cal.App.4th 801, 808 ["Stacy's actual notice of the wrongful death action was not legally sufficient to accomplish joinder. A party cannot be properly joined unless served with the summons and complaint; notice does not substitute for proper service. Until statutory requirements are satisfied, the court lacks jurisdiction over a defendant"].)

The probate court noted that appellants claim "the remainder and contingent remainder beneficiaries are indispensable parties" because "undistributed income [from the Angelique Trust] is converted to . . . principal . . . ." Therefore, respondent's requested distributions from the Angelique Trust's income "will necessarily impact the amount of principal to be allocated to the remainder and contingent beneficiaries following [respondent's] death." The Angelique Trust instrument states that, upon respondent's death, "'any then remaining principal of [her] share shall be divided, per stirpes, among Mary Glyde Barbey's then living issue other than [respondent's issue] . . . .'"

In rejecting appellants' argument, the probate court reasoned: "The remainder and contingent remainder beneficiaries . . . do not have 'similar interests' to those of [respondent] in the funds held by the [Angelique] [T]rust. [Respondent's] request[] do[es] not 'necessarily' and 'inevitably' affect the rights of the remainder and contingent beneficiaries, as baldly claimed by [appellants]."

27

The court explained: "[T]he [Angelique] [T]rust permits [respondent] to obtain up to all of the income of the trust, and for the principal of the trust to be invaded as necessary to meet any emergency affecting [respondent's] health or maintenance. Under these terms alone, it is possible that the entire amount held in trust for [respondent] could be paid out to her entirely pursuant to the terms of the trust, leaving nothing for any remainder beneficiary to obtain following her death. As a result, 'inevitable' impact on the remainder beneficiaries' interests does not exist. Further, to the extent that the trust does contain principal at the time of [respondent's] death, and a pre-deceased sibling of hers has exercised their own power of appointment to divert the per stirpes share of the principal away from their child or children, the contingent remainder beneficiary child of that sibling would receive nothing. Once again, any judgment in [respondent's] favor on her petitions seeking additional distributions from the trust does not 'necessarily' or 'inevitably' impact the contingent remainder beneficiaries."

But section 389 does not say that, to be a necessary party, the disposition of the action must "necessarily" or "inevitably" impact the absent party's interest. Section 389, subdivision (a) provides that a necessary party is one who "claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence *may* [not must] . . . as a practical matter impair or impede his ability to protect that interest . . . ." The remainder and contingent remainder beneficiaries claim an interest in the Angelique Trust. Upon respondent's death, they are entitled to share in whatever principal remains in the trust. The less income distributed to respondent, the greater that principal will be. In the absence of

28

the remainder and contingent beneficiaries, the disposition of respondent's request for $1 million to cover her attorney fees "may . . . as a practical matter impair or impede [their] ability to protect" their interest in the trust principal. (*Ibid*.)

The remainder and contingent remainder beneficiaries cannot rely on appellants to represent their interest. As trustees of the Angelique Trust, appellants owe a fiduciary duty to respondent, the sole lifetime beneficiary of the trust, as well as to the remainder and contingent remainder beneficiaries. "Trustees owe all beneficiaries, including . . . income beneficiaries . . . , a fiduciary duty." (*Hearst v. Ganzi* (2006) 145 Cal.App.4th 1195, 1208.)

In the Distribution Petition respondent acknowledged the conflict between her and the remainder beneficiaries: "By failing to distribute all net income and retaining that income in the [Angelique] Trust, [appellants] have converted the Trust's income to principal, effectively further harming [respondent's] interests and benefiting the remainder beneficiaries' interests . . . ." (Italics omitted.) Respondent made the same point in the Second Amended Petition: "[E]very income dollar *not* distributed to [respondent] and converted to principal is—in effect—taken from [respondent] and given to the remainder beneficiaries of the [Angelique] Trust . . . , as [respondent] does not have access to the principal of the [Angelique] Trust in the same way that she has access to the income thereof." Appellants observe that "the reverse is true as well, that every dollar distributed to [respondent] is a dollar that will be forever unavailable to the remainder and contingent remainder beneficiaries."

In its minute order overruling the demurrer, the probate court recognized the conflict between respondent and the other

29

beneficiaries of the Angelique Trust: "By failing to distribute all net income and retaining it into the trust, [appellants] have converted the Trust's income to principal, which harms [respondent's] interests and benefits the remainder beneficiaries' interests . . . ."

"[W]here [as here] a number of persons have undetermined interests in the same property, or in a particular trust fund, and one of them seeks, in an action, to recover the whole, to fix his share, or to recover a portion claimed by him[,] [t]he other persons with similar interests are [necessary] parties. The reason is that a judgment in favor of one claimant for part of the property or fund would necessarily determine the amount or extent which remains available to the others." (*Bank of California Nat. Assn. v. Superior Court* (1940) 16 Cal.2d 516, 521; see also *Security-First Nat. Bank of Los Angeles v. Superior Court* (1951) 104 Cal.App.2d 227, 232 ["[Necessary] parties are such persons as have undetermined interests in the same trust fund"].)

Accordingly, the probate court erred in ruling that the remainder beneficiaries are not necessary parties. On the other hand, it did not err in finding that the contingent remainder beneficiaries are not necessary parties. Since the contingent remainder beneficiaries are the children of the remainder beneficiaries, the children's interests are adequately represented by the still-living remainder beneficiaries, i.e., respondent's siblings. (See *Verizon California Inc. v. Board of Equalization* (2014) 230 Cal.App.4th 666, 684 [an absent "'party's ability to protect its interest is not impaired or impeded as a practical matter where a joined party has the same interest in the litigation'"]; Code Civ. Proc., § 382 ["when the question is one of a

30

common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all"].)

Thus, the probate court erroneously overruled appellants' demurrer. It should have sustained the demurrer with leave to amend the Distribution Petition to add the necessary parties, i.e., the remainder beneficiaries. "If [a necessary party] has not been . . . joined, the court shall order that he be made a party." (§ 389, subd. (a).) As the probate court observed, there is no evidence that the remainder beneficiaries cannot be joined as parties: "[Appellants] wish this Court to conclude that the remainder beneficiaries . . . are not subject to California jurisdiction, by referring to nothing more than the fact that most or all live outside of the State of California, as reflected by the addresses at which they were provided notice by [respondent]. However, that an individual resides outside of California is not determinative of the issue of California jurisdiction over the party. No evidence is provided . . . that the factors relevant to such a determination are supported by evidence showing that the absent remainder . . . beneficiaries have insufficient contacts with California to permit California to exercise jurisdiction over them." (See *Goodyear Dunlop Tires Operations, S.A. v. Brown* (2011) 564 U.S. 915, 923 ["The canonical opinion in this area remains *International Shoe* [*Co. v. Washington, supra,*] 326 U.S. 310, . . . in which [the United States Supreme Court] held that a State may authorize its courts to exercise personal jurisdiction over an out-of-state defendant if the defendant has 'certain minimum contacts with [the State] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice"'"].)

31

Thomas Barbey, respondent's brother and a remainder beneficiary, subjected himself to the probate court's jurisdiction by filing his petition against respondent's financial advisers. (See *ante*, at pp. 4-5.) According to the probate court's order granting the Distribution Petition, Thomas Barbey appeared through his counsel at the hearing on the Distribution Petition.

On remand, if the remainder beneficiaries cannot be joined, the probate court should proceed as set forth in section 389, subdivision (b): "[T]he court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice, the absent person being thus regarded as indispensable."[9]

*The Probate Court Erroneously Refused to*
*Conduct an Evidentiary Hearing*

Appellants requested an evidentiary hearing on respondent's Distribution Petition. In open court appellants' counsel declared, "[F]rom an evidentiary hearing, what we were hoping to get . . . was, what do you [respondent] need the money for and why do you need it and the information that would support that." Respondent's counsel protested that "in our June letter" he had "explicitly detail[ed] the need for distributions and

---

[9] If Thomas Barbey can be joined as a party to the Distribution Petition but the three other remainder beneficiaries cannot be joined, the probate court should consider whether Thomas Barbey would adequately represent the interests of the absent remainder beneficiaries. (See the discussion, *ante*, at pp. 30-31.) In her will Mary wrote: "My daughter Katrina Burrus and my son Thomas Hooker [also known as Thomas Barbey] shall act as advisors to the Trustee [of the Angelique Trust] regarding distributions to [respondent]. I have complete confidence in their judgment regarding the best interests of [respondent]."

explicitly [made] a request for distributions of over a million dollars and, going forward, net income distributions." Respondent's counsel said appellants' counsel "either has not read [the June letter] or is intentionally misrepresenting that." Respondent's counsel continued: "[I]t would be manifestly unjust for the trustees to say that . . . the only beneficiary entitled to anything from the trust right now has to engage counsel and participate in a trial without any funds to do so before she can get distributions." "In the great scheme of things, the $1,000,000 distribution . . . from the retained income held in the trust is very modest."

The court did not conduct an evidentiary hearing. It explained: "This is a case where the dollar amounts at issue are such that while to some persons a million sounds like a lot, the history here suggests that it's not . . . . [¶] So to leave a beneficiary in a position where they are unable to respond to significant litigation under the particular circumstances of this trust seems to the Court, in fact, to be unjust. And so I am going to order the distribution."

Appellants argue: "[B]y granting [the Distribution] Petition without an evidentiary hearing, the trial court committed a structural error that deprives this Court of the ability to determine what evidence would have been introduced at the hearing and whether [respondent] could meet her burden of establishing that she was entitled to payment of her attorneys' fees and legal expenses from the trust and that [appellants] breached their fiduciary duties by not distributing $1,000,000 to her based on her unsupported demand. This mandates reversal."

"It has long been the rule that in probate matters 'affidavits may not be used in evidence unless permitted by statute. . . .'"

33

(*Estate of Bennett* (2008) 163 Cal.App.4th 1303, 1308-1309.) "[T]he Probate Code limits the use of affidavits to 'uncontested proceeding[s].'" (*Id.* at p. 1309.) "Consequently, 'when challenged in a lower court, affidavits and verified petitions may not be considered as evidence at a contested probate hearing. . . .'" (*Ibid.*) The relevant statute is section 1022, which provides, "An affidavit or verified petition shall be received as evidence when offered in an *uncontested* proceeding under this code." (Italics added.)

The Distribution Petition was contested. Therefore, "the probate court should have granted the request for an evidentiary hearing . . . ." (*Estate of Lensch* (2009) 177 Cal.App.4th 667, 677.) "The Probate Code anticipates that a party may submit a matter on a verified petition alone. However, once a petition is contested, as this one was, the court erred in refusing to permit appellants to proceed to an evidentiary hearing on the question of [respondent's need for the $1 million distribution]." (*Id.* at p. 678; accord, *Estate of Bennett*, *supra*, 163 Cal.App.4th at pp. 1308-1309; see *Levy v. Toyota Motor Sales, U.S.A., Inc.* (1992) 4 Cal.App.4th 807, 816 [party seeking attorney fees "had the burden of showing that the fees incurred were 'allowable,' were 'reasonably necessary to the conduct of the litigation,' and were 'reasonable in amount'"].)

We are reversing the order instructing appellants to make the $1 million payment to respondent because the probate court erroneously overruled appellants' demurrer. Thus, we need not determine whether the denial of appellants' request for an evidentiary hearing was structural error mandating a reversal. If on remand appellants again request an evidentiary hearing to determine respondent's need for $1 million in attorney fees, the

probate court should conduct such a hearing and make its ruling. We express no opinion on how the probate court should rule.

*Disposition*

The December 16, 2022 order instructing appellants to pay $1 million to respondent to cover her attorney fees is reversed. In all other respects, the December 16, 2022 order is affirmed. The matter is remanded to the probate court with directions to vacate its order overruling appellants' demurrer to the Distribution Petition and to enter a new order sustaining the demurrer with leave to amend to join the remainder beneficiaries as necessary parties. The probate court shall thereafter proceed pursuant to the views expressed in this opinion. Each side shall bear its costs on appeal.

NOT TO BE PUBLISHED.


YEGAN, J.

We concur:


GILBERT, P. J.


CODY, J.

35

Colleen K. Sterne, Judge

Superior Court County of Santa Barbara

_____

Snell & Wilmer, Howard M. Privette and Jing (Jenny) Hua, for Defendants and Appellants.

Mullen & Henzell, Jana S. Johnston and Allegra Geller-Kudrow; Will Tomlinson, for Plaintiff and Respondent.